IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LISA SHARKEY (as personal representative for the ESTATE OF PAUL GLEICHER), CASEY GLEICHER, DOUGLAS GLEICHER, and GREGORY GLEICHER,<br><br>    Plaintiffs,<br><br>v.<br><br>COSTASUR DOMINICANA, S.A. (d/b/a CASA DE CAMPO RESORT & VILLAS), CENTRAL ROMANA CORPORATION, LTD., and A.V. BLANDINO & CÍA, S.A.,<br><br>    Defendants. | **JURY TRIAL DEMANDED**<br><br>Cause No. _____ |

**COMPLAINT**

COMES NOW, Plaintiffs Lisa Sharkey, personally and as personal representative of the

Estate of Paul Gleicher, Casey Gleicher, Douglas Gleicher, and Gregory Gleicher and for their

Complaint against Defendants Costasur Dominicana, S.A. (d/b/a Casa de Campo Resort &

Villas) ("Casa de Campo"), Central Romana Corporation, Ltd. ("Central Romana"), and A.V.

Blandino & Cía, S.A. ("Blandino") state as follows:

**INTRODUCTION**

1.      This is a wrongful death action under N.Y. Est. Powers & Trust Law § 5-4.1 and a

survivor action under N.Y. Est. Powers & Trust Law § 11-3.2(b), as well as an action for the

interference with the right of sepulcher, brought by Plaintiff Sharkey, the surviving spouse and

1

personal representative of Decedent Gleicher, and Plaintiffs Casey Gleicher, Douglas Gleicher, and Gregory Gleicher, Decedent's surviving children.

2.      Decedent Gleicher and Plaintiff Sharkey booked a trip for their family and guests for the 2025/2026 year-end holiday at Casa de Campo Resort and Villas—a five-star resort in the Dominican Republic owned and jointly operated by Defendant Casa de Campo and its parent company, Defendant Central Romana. They were promised first-class amenities, including award-winning golf courses, gourmet food and drinks, and, if necessary, premier, state-of-the-art medical services at the resort's own privately-owned hospital, where guests received priority "VIP" treatment.

3.      This, however, proved false—what was supposed and warranted to be a luxurious and safe vacation in paradise turned into a fatal nightmare.

4.      While dining at a restaurant owned and operated by the resort, Decedent Gleicher was served an alcoholic drink contaminated with methanol, which contamination occurred either intentionally to cut the alcohol, or because the restaurant illegally and unsafely distilled the alcohol.

5.      Later, while golfing on the resort, Decedent Gleicher had an acute onset of severe and excruciating stomach pain that incapacitated him. The resort was promptly alerted of the emergency. But rather than receive the medical care he was promised, Decedent Gleicher was transported to a sub-standard facility that, despite its advertisements, lacked qualified doctors, basic competency—such as standard hygiene, charting, and triage protocols— and standard equipment, such as MRI imaging and dialysis machines. Further, despite his extreme pain and critical condition, the hospital refused to take any insurance and extorted exorbitant upfront

2

payments from the Gleicher family as a precondition to giving Decedent Gleicher the critical care he needed.

6. Further, not only was the resort hospital incapable of treating Decedent Gleicher, it materially interfered with the oversight of Decedent Gleicher's care by his New York doctors. After preliminary testing showed that Decedent Gleicher was suffering from acute pancreatitis, Plaintiff Sharkey obtained assistance from doctors in New York to oversee and coordinate his care. Their first and immediate response was to recommend an air ambulance to evacuate Decedent from the resort hospital to New York. But the resort hospital doctors— through multiple phone calls and texts directed to New York— misrepresented his conditions, saying his pain was improving, when it was not, and that the results of his bloodwork tests indicated that he was stable and improving, when he was not.

7. The resort doctors also misrepresented to the New York doctors and the Gleicher family that they would look into testing Decedent Gleicher for methanol or similar poisoning, and, if positive, take steps to administer treatments to counter the toxin. In reality, the resort doctors did no such thing.

8. Further, the resort hospital doctors misrepresented Decedent Gleicher's condition to his medical insurer. Plaintiff Sharkey attempted to get insurance to cover an immediate air evacuation of Decedent Gleicher. But those efforts were thwarted by the resort hospital doctors, who called the insurance company in the United States, and again misrepresented his condition and told the insurer that an air evacuation was unnecessary. Based on this misrepresentation, the insurer denied the evacuation request.

9. These collective misrepresentations created a false sense of security amongst Decedent Gleicher's New York doctors and family, causing him to remain under the care of the

resort hospital, which lacked basic expertise and equipment to care for him. As a result, the existence of the methanol toxin, for which there was an antidote, continued undetected in Decedent's system and untreated; the hospital grossly under-administered critical IV hydration therapy; it failed to proactively monitor him for worsening conditions, such as multi-organ failure; and when it was apparent that his organs, including his kidneys and liver, were indeed failing, the resort hospital failed to provide critical treatment, such as dialysis, which it did not even have the capacity to administer. As a result, Decedent Gleicher's pancreatitis, predictably, worsened, resulting in multi-organ failure and, tragically, his untimely death.

10.    The tragedy, however, did not end there. Following his death, the Gleicher family, per the laws of their Jewish faith, worked through a local rabbi and the U.S. State Department to receive a religious exemption from an autopsy and an immediate repatriation of Decedent Gleicher's body back to their home in New York for burial.

11.    The resort hospital, however, failed to take basic steps to secure the chain of custody of Decedent Gleicher's body, including failing to properly tag the body. As a result, the resort hospital mixed up Decedent Gleicher's body and delivered *the wrong body* for transport to New York to funeral services provider Defendant Blandino (who also negligently failed to properly confirm the identity of the body). This incorrect body delivery was not discovered until Plaintiff Sharkey and other family members viewed the body in New York. In the meantime, the resort hospital sent Decedent Gleicher's body to the Dominican Republic forensic examiner's office, who, in violation of the religious exemption and the family's faith, performed an autopsy on his body.

12.    For this, and the reasons stated below, Plaintiffs, through this action, seek all remedies available at law and equity for the tragic and wrongful death of Decedent Gleicher and

4

the mishandling of his body, including compensatory damages, punitive damages, and attorneys' fees and costs.

## PARTIES

13.    Plaintiff Sharkey is a New York citizen, domiciled in New York City, New York. She is the widow of Decedent Gleicher, and personal representative of his estate. She is a career journalist, who has worked as a producer for various prominent national television news networks, winning multiple awards for her work. She currently works as a publisher for a major publishing company, publishing multiple best-selling non-fiction books, and as a lecturer in various courses covering topics about the business and mechanics of the publishing industry.

14.    Decedent was a New York citizen domiciled in New York City, New York. He was a distinguished architect and devoted husband and father, among many other things.

15.    Plaintiff Casey Gleicher is a New York citizen, domiciled in New York City, New York. She is Decedent's surviving daughter.

16.    Plaintiff Douglas Gleicher is a New York citizen, domiciled in New York City. He is one of Decedent's surviving sons.

17.    Plaintiff Gregory Gleicher is a Missouri citizen, domiciled in St. Louis, Missouri. He is Decedent's other surviving son.

18.    Defendant Casa de Campo is a Dominican Republic company with its principal place of business in the Dominican Republic. It owns and operates Casa de Campo Resort & Villas, a large integrated luxury resort in La Romana, Dominican Republic. It is a wholly-owned subsidiary of Defendant Central Romana.

19.    Defendant Central Romana is a Dominican Republic company with its principal place of business in the Dominican Republic. Owned and controlled by the Fanjul family (who

are United States citizens), it is the largest privately held enterprise in the Dominican Republic. It is the owner and operator of the resort hospital at issue, and is the parent corporation of Defendant Casa de Campo. It is also engaged in myriad other business lines, including sugar production, milling, refining, and export, cattle ranching and dairy, real estate development, and transportation and aviation infrastructure.

20.    Defendant Blandino is a funeral service provider organized under the laws of the Dominican Republic, with its principal place of business in the Dominican Republic. Plaintiff Sharkey contracted with Blandino to embalm and deliver Decedent Gleicher's body to New York following his death. Pursuant to its contract with Plaintiff Sharkey, Blandino, as will be described in more detail below, negligently shipped the wrong body to New York.

### JURISDICTION AND VENUE

21.    This Court has personal jurisdiction over Defendants under Federal Rule of Civil Procedure 4(k)(1)(A) and New York Civil Practice Law and Rules § 302(a)(1) and (3), and consistent with the Due Process Clause of the Fourteenth Amendment to the United States Constitution, because, as set forth more fully below, Defendants transact business within New York and have purposefully availed themselves of the privileges of conducting activities in New York, committed a tortious act outside of New York causing injury in New York, and Plaintiffs' claims arise out of and relate to those contacts.

22.    More specifically, Defendants Casa de Campo and Central Romana transact business within New York within the meaning of CPLR § 302(a)(1). For years, and as detailed below, they directed a sustained, targeted marketing and sales campaign into New York, including personalized email solicitations sent to Plaintiff Sharkey and Decedent Gleicher at their New York addresses, a New York-directed reservation infrastructure (a U.S. toll-free line

6

and a 24/7 sales team), and executives—Casa de Campo's Chief Marketing Officer and its Vice President of Sales, North America—who oversee this New York-targeted outreach. Plaintiff Sharkey and Decedent Gleicher booked the subject trip from New York in reliance on those communications. Defendants have derived substantial revenue over multiple years from New York guests solicited and booked in this manner. Plaintiffs' claims arise directly out of this transaction of business in New York.

23.     Personal jurisdiction over Defendant Central Romana is further proper because Central Romana owns and operates the resort hospital marketed into New York and approved and supplied the hospital-related representations disseminated to Plaintiff Sharkey and Decedent Gleicher in New York. In addition, as will be discussed below, Central Romana's personnel purposefully directed communications into New York and the United States concerning Decedent Gleicher's care—including a telephone call to Decedent's insurer in the United States and the treating physicians' calls and text messages with Decedent Gleicher's doctors in New York—which were made within the scope of Central Romana's business and which Central Romana knew or should have known would cause treatment and evacuation decisions, and resulting injury, to occur in New York. Further, after Decedent's death, Central Romana delivered the wrong body to Defendant Blandino, knowing that the body was destined for New York on an expedited basis for a funeral. These actions constitute transacting business in New York under CPLR § 302(a)(1). Further, under CPLR § 302(a)(3), these tortious acts caused injury in New York, including the denial of the air-ambulance claim, Plaintiff Sharkey's out-of-pocket payments and her prepayment of more than $50,000 for an air ambulance out of New York-based accounts, and the injuries attendant to the wrongful delivery of Decedent's remains to his family in New York.

7

24.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims — including Defendants' marketing communications to Plaintiff Sharkey and Decedent Gleicher, Plaintiff's and Decedent Gleicher's reliance on those communications, Decedent Gleicher's booking of the relevant trip from New York, the misrepresentations directed to Decedent Gleicher's New York treating physicians, and the wrongful delivery of remains to Decedent Gleicher's family in New York — occurred in this District, and additionally under 28 U.S.C. § 1391(c)(3) as Defendants are not resident in the United States.

25.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(2) because complete diversity of citizenship exists— Plaintiffs are citizens of the States of New York and Missouri, while Defendants are citizens of the Dominican Republic— and the amount in controversy substantially exceeds the sum of $75,000, exclusive of interest and costs.

<strong><u>GENERAL FACTUAL ALLEGATIONS</u></strong>

**A.      Defendants Misrepresented Their Hospital Services to Plaintiff Sharkey and Decedent Gleicher.**

26.     The Casa de Campo Resort & Villas is a 7,000-acre luxury resort that operates as an "all-in-one" five-star destination. Unlike most international resorts that bundle a hotel with selected amenities, Casa de Campo's commercial model is that virtually every service a guest could want during the stay— lodging, food and beverage, golf, equestrian, marina, beaches, spa, fitness, shopping, cultural events, and medical care— is provided on the resort's own grounds.

27.     Defendant Casa de Campo's parent, Defendant Central Romana, is directly involved in the operations of the Casa de Campo resort. For example, it owns and operates the Altos de Chavón complex— a Mediterranean-style cultural village, which includes, among other things, a museum and several on-property bars and restaurants. The village is on the resort

grounds and is available exclusively to resort guests and residents. As will be described below, Defendant Casa de Campo markets this complex as one of the resort's amenities.

28.    Defendant Central Romana also owns and operates the resort hospital, which operates under the Health Services Division of Central Romana's corporate structure. As will be described in more detail below, Defendants market the hospital as a resort amenity.

29.    The Casa de Campo resort's number one market is the United States, and it devotes a substantial portion of its annual multi-million dollar marketing budget to the United States, including New York.

30.    Defendant Casa de Campo's Chief Marketing Officer and its Vice President of Sales, North America are based in Miami, Florida and operate out of a Casa de Campo office in Miami.

31.    Casa de Campo's marketing efforts include an English language consumer-facing website, a U.S. toll-free sales and reservation infrastructure, which includes a U.S. number and a U.S. sales team handling reservations and questions twenty-four hours a day, and a network of U.S. luxury travel intermediaries, such as booking platforms like Expedia Luxury and relationships with U.S. corporate incentive travel firms.

32.    Foremost amongst Casa de Campo's marketing strategies in the U.S. is direct consumer marketing through email and social media. For example, Defendant Casa de Campo maintains a vast database of email addresses that Defendants have acquired through their marketing efforts, and routinely and systematically sends personally-addressed email solicitations to these addresses about the resort and its amenities. These email campaigns offer promotions and urge consumers to click on a link to Defendant Casa de Campo's website, where

they can book rooms. A substantial number of these direct email campaigns were directed to New York citizens in New York.

33.     Plaintiff Sharkey and Decedent Gleicher were longtime recipients of these marketing emails. Indeed, for multiple years preceding Decedent Gleicher's fatal encounter at the resort, and at least throughout the period from 2020 to January 2026, Plaintiff Sharkey and Decedent Gleicher each received these promotional emails at least weekly. These solicitations were sent to their personal email addresses while they were present in New York.

34.     These emails that were sent to them in New York were not undifferentiated bulk marketing, but database-driven targeted customer outreach. Each of the emails were targeted to Plaintiff Sharkey and Decedent Gleicher, addressing them by name. And each of these email solicitations contained prominent links to Defendant Casa de Campo's website, which strongly encouraged Plaintiff Sharkey and Decedent Gleicher to visit the site to receive deals on room discounts and other offerings.

35.     For example, one solicitation sent in 2024, was an email to Plaintiff Sharkey with a subject line addressing her by first name: "Hi Lisa, it's been too long! Casa de Campo misses you." The email contained a prominent call to action button titled "I Miss You Too," which, if pressed, opened a browser to the resort's main website. Other links containing "special offers" and "experiences" also took the user to various portions of the company's website. Decedent Gleicher received the same email addressed directly to him.

36.     For at least six years, Plaintiff Sharkey and Decedent Gleicher received these emails, viewed them, and often visited the resort's website through the links, as prompted to do.

37.     Through this direct to consumer email marketing, Casa de Campo advertised its own services and amenities, as well as those related services and amenities owned and controlled by its parent, Defendant Central Romana corporation.

38.     For example, Casa de Campo routinely marketed the amenities of Altos de Chavón— the Mediterranean complex owned and operated by Central Romana—through these direct emails to Plaintiff Sharkey and Decedent Gleicher and the website to which they were directed. Casa de Campo marketed the complex as its "own" amenity available to all guests and residents.

39.     Defendant Casa de Campo also advertised Central Romana's hospital as an amenity of the resort. Plaintiff Sharkey and Decedent Gleicher began receiving emails that included information about the resort's hospital amenities during the time of the COVID 19 pandemic, when the resort was trying to lure customers with promises of its COVID 19 preparedness and the resort's ability to treat patients stricken ill by the virus. They reviewed these emails and, pursuant to the prompt of the emails, visited the website and viewed its representations about hospital services.

40.     For example, multiple emails that Defendant Casa de Campo sent to them in New York at their New York email addresses promoted the resort's commitment to safety, wellness, and health, including the resort's ability to provide emergency services for medical illness. One example is a personally-addressed email dated November 23, 2020 which Casa de Campo sent to both Plaintiff Sharkey and Decedent Gleicher, assuring them that if anyone fell critically ill while at the resort, the resort would arrange for "medical attention by specialists, medical transfers, [and] transfer of a relative," among other things.

11

41.     Another example is an email Casa de Campo sent to both Plaintiff Sharkey and Decedent Gleicher at their New York email addresses dated June 24, 2020, which stated: "Lisa, [Paul,] Now that we're all thinking about travelling again, it's important that you know our health and safety program 'Casa Cares,' which highlights our new standards in safeguarding the well-being of our guests and the entire Casa de Campo community." The email then requested that they read more about the Casa Cares program, with a prominent link to their website that said "Keep Reading."

42.     The link was to a page on the website that advertised the resort's "commitment to safety," which includes hospital services: "The Central Romana Medical Center, a private hospital *and part of Casa de Campo*, is less than 5-minutes away. The facility is equipped with the latest equipment and it's regarded as being one of the top medical facilities in the country. We provide complimentary transfers for non-emergency treatments, as well as 911 service with an ambulance permanently on site for emergency transfers, if required. Casa de Campo guests receive priority attention, translation services and preferred assistance at our private, VIP medical center." (Emphasis added).

43.     Another portion of the website to which Plaintiff Sharkey and Decedent Gleicher were directed to by the marketing emails assured them that resort guests had access to a "private hospital with the highest standards (and complete Diagnostics Center with MRI)," and that the resort "also had emergency 911 services: an ambulance that is permanently onsite for emergency transfer if required." It further stated "Casa de Campo guests receive priority attention, translation services and preferred assistance at our private, VIP medical center."  It continued: "As always, the team at Casa de Campo remains vigilant and committed to offering the highest health and safety standards that our guests expect of us. With that in mind, we continue to

12

welcome guests to our resort and will do everything we can to ensure they have an enjoyable stay."

44.    Since at least 2020 to present, Casa de Campo has continuously marketed the Central Romana hospital services as an amenity to the resort through the direct marketing emails sent to Plaintiff Sharkey and Decedent Gleicher in New York, as well as through its website to which the marketing emails linked. Today, the website continues to advertise: "On Site Medical Facilities: Casa de Campo guests have access to 24/7 medical assistance directly in your villa and complimentary transportation to our private hospital in case of emergency. Casa de Campo guests also receive priority attention, and preferred assistance at the hospital, including translation services."

45.    Casa de Campo has further marketed Central Romana's services as its own on social media. For example, on May 5, 2021, Casa de Campo posted a message on Twitter/X touting its "#CasaCares program," which it stated provides "attendees VIP Access to the resort's on-site hospital, Central Romana Medical Center."

46.    Plaintiff Sharkey and Decedent Gleicher saw and relied upon the above-described representations about Casa de Campo's hospital services in making their decision to come to the resort. Prior to Decedent Gleicher's death, the couple had been recurring guests over the course of the last decade. When the COVID 19 pandemic hit, they became increasingly concerned about safety and medical treatment in the case of emergency. They read the emails sent to them in New York and the representations on the website to which those emails directed them, and believed that Casa de Campo did indeed have its own hospital with state-of-the-art equipment, and that in the event of an emergency, they would have ambulance services available, receive priority "VIP" treatment at the hospital, and that there would be translation services. Therefore, since 2020,

13

Plaintiff Sharkey and Decedent Gleicher developed, through these representations, a continuing understanding and belief that such services would be provided in the event of a medical emergency. These representations were material to each and every decision they made to book a room or villa and come to the resort. Indeed, had the resort not assured them of these hospital services, they would have stopped coming to the resort in 2020.

47.     As will be described in more detail below, these representations were false. The Central Romana hospital did not have state-of-the-art equipment— indeed, it lacked basic equipment necessary to diagnose and treat life-threatening illnesses. There was no real ambulance on the resort premises; there was no "VIP" or priority treatment available or given to guests; there were no translation services; there were no medical air evacuation services; and guests were forced to pay out of pocket thousands of dollars before receiving treatment, even if they were critically ill and would die without such treatment.

**B.     Defendants Central Romana and Casa de Campo Operated the Resort and Its Amenities as a Joint Enterprise.**

48.     At all relevant times, the operation of the Casa de Campo resort, including the resort hospital amenity advertised by Casa de Campo, was a joint enterprise between Defendant Casa de Campo, and its parent company, Defendant Central Romana. As described above, both owned and operated aspects of the resort, which they collectively advertised as a unified, all-inclusive experience for resort guests. Defendant Central Romana owned and operated key features of the resort, including, among other things, the Altos de Chavón complex and the resort hospital. Indeed, Defendant Casa de Campo, with the knowledge and approval of Defendant Central Romana, repeatedly advertised the hospital as a private hospital owned by the resort and available for guests.

14

49.     Defendant Central Romana authorized, and is bound by, the hospital-related representations disseminated into New York. Central Romana owned and operated the Central Romana Medical Center and, through its Health Services Division, created, supplied, or approved the descriptions of the hospital's capabilities and the "VIP priority," translation, ambulance, and "state-of-the-art" representations that appeared in Casa de Campo's New York-facing emails and website, including the representation that the "Central Romana Medical Center, a private hospital," is "part of Casa de Campo." By these manifestations, Central Romana held out Casa de Campo as authorized to speak about the hospital's services on Central Romana's behalf, and Plaintiff Sharkey and Decedent Gleicher reasonably relied on that apparent authority in New York.

50.     The operation of the resort and its hospital amenity as a joint enterprise is further shown by the Defendants' common purpose of marketing and delivering an integrated, all-inclusive resort experience; their common financial interest in, and sharing of the revenues derived from, that experience; and their common control over resort operations and marketing.

51.     Thus, Defendant Casa de Campo was Defendant Central Romana's actual and apparent agent, with respect to the promotion and delivery of services and other amenities at the resort, including the hospital services described herein.

52.     Defendant Central Romana is thus jointly and vicariously liable for all of Defendant Casa de Campo's wrongful conduct alleged herein.

53.     Defendant Central Romana, being an international conglomerate, and Defendant Casa de Campo, routinely hosting guests from around the world, including the U.S., both derive substantial revenue from interstate and international commerce.

C.    **Decedent Gleicher Was Poisoned and, Due to Deficient Medical Care, Died.**

54.    Plaintiff Sharkey and Decedent Gleicher booked a stay for a 2025/2026 year-end holiday trip at a Casa de Campo villa for themselves, two of their children—Plaintiffs Casey Gleicher and Douglas Gleicher—and other guests. They booked the trip for December 25, 2025 to January 4, 2026.

55.    Decedent Gleicher was, at the time, a fit 69-year-old. He swam religiously for 90 minutes a day, maintained a strict and healthy diet, and, according to a recent cardiac exam, which included sonographic imaging of his arteries, was in good cardiovascular health, with no significant atherosclerosis. He did not use drugs, he did not smoke, and drank alcohol only occasionally on special occasions. He was also in good pancreatic health, with no gallstones or other conditions putting him at risk for pancreas obstruction or development of pancreatitis.

56.    During their stay, the Gleicher family and guests took advantage of many of the resort amenities, including the golf courses, spas, and resort restaurants.

57.    While dining at one of the resort restaurants, Decedent Gleicher was served a mixed alcoholic drink that was contaminated with methanol. This contamination occurred one of two ways: (1) cheaper methanol was intentionally added to the resort's ethanol-based beverage alcohol as a means of "cutting" or diluting the beverage alcohol so as to increase profits per bottle; or (2) it was formed as a byproduct of improperly distilled bootlegged alcohol. Both of these types of methanol contamination are well known and documented types of contaminations that occur in the Dominican Republic and similar Caribbean countries.

58.    Methanol is a known cause of pancreatitis. The pancreas is a large secretory gland responsible for the manufacture and transport of digestive enzymes. Pancreatitis occurs when the digestive enzymes the pancreas produces activate inside the pancreas itself before being exported

16

to the small intestine. Once the enzymes activate inside the pancreas, they begin digesting the pancreas itself and surrounding tissues, which, if untreated, can lead to a cascade of injury, including edema, hemorrhage, necrosis, inflammation, and ultimately multi-organ failure. Methanol is known to, among other things, cause the premature activation of digestive enzymes inside the pancreas, leading to acute pancreatitis.

59.     The methanol-contaminated alcohol that Decedent consumed at the resort, caused him to develop pancreatitis, which developed quietly at first, but quickly escalated into severe and critical acute pancreatitis.

60.     On the afternoon of January 3, 2026, after consuming the contaminated drink, Decedent Gleicher was golfing at one of the resort golf courses with one of the members of his party. While golfing, he was overcome with extreme pain in his stomach area. His pain was excruciating— a 10 out of 10— and he could not stand or speak coherently. He began screaming and moaning uncontrollably. He also began vomiting.

61.     Contrary to Casa de Campo's representations, there were no qualified medical professionals onsite at the resort. There was also no real ambulance.

62.     Instead, two untrained people showed up in an "ambulance," which was not more than a van. The people did not speak English and could not properly communicate with Decedent Gleicher or his family. The van had no medical equipment and neither did the employees. The employees did not take Decedent Gleicher's blood pressure and performed no medical tests. There was not even a bucket or container to handle Decedent Gleicher's vomiting.

63.     The employees put Decedent Gleicher in the van and drove him to the Central Romana hospital along with Plaintiff Sharkey and one of his children. The hospital was not on

17

premises or less than five minutes away as advertised. Instead, it was 30 minutes away. Decedent Gleicher moaned, screamed, and vomited the entire way.

64.    When they arrived at the hospital, the family was shocked at the condition of the hospital. Decedent Gleicher was admitted to the emergency room, which was unsanitary and lacking in equipment and staff.

65.    Decedent Gleicher and his family did not receive priority or "VIP" treatment as advertised. No one in the emergency room spoke English and there were no translation services, as advertised, which impeded the family's ability to communicate with the hospital. Indeed, despite his screams and moans, Decedent Gleicher was just put on a stretcher and left unattended in the emergency room.

66.    He had previously removed his shirt due to his profuse sweating, and was shivering on the stretcher. The hospital staff brought him no blanket. The family was forced to cover him in his own shirt, dirtied with his vomit, to attempt to keep him warm.

67.    He was not charted and no one checked his vitals, like temperature, pulse, and blood pressure. No tests of any kind were performed.

68.    He vomited on himself and the emergency room floor. The hospital staff saw this but did not clean it up, despite Plaintiff Sharkey's repeated requests that they do so. Plaintiff Sharkey and other family members were forced to clean it up with paper towels.

69.    At this point, Plaintiff Sharkey began to panic, and so she called on FaceTime a friend, Dr. Marc Siegel, M.D., a renowned internist, author, clinical professor at NYU Langone's Department of Medicine, network news medical contributor, and a former public-health adviser. Dr. Siegel was at all times in New York City, and monitored Decedent Gleicher's care from New York City.

18

70.     While on FaceTime, Dr. Siegel attempted to communicate with the emergency room staff, but could not effectively do so because no one spoke English and there was no translator. He urged the staff to attend to Decedent Gleicher and was shocked to discover that they had not yet taken any vitals or done any bloodwork.

71.     After hours of Decedent writhing in pain and the family begging for help, the hospital staff finally started taking his blood pressure, drew blood, and gave Decedent Gleicher an EKG. They, however, did not record any measurements or chart him. They then gave him morphine through an IV, but did not swab his arm with alcohol before injecting him. They also performed a sonogram.

72.     The bloodwork and other results came back, indicating that Decedent Gleicher was suffering from acute pancreatitis. Plaintiff Sharkey captured the results of his bloodwork and sonogram through her phone camera and texted them to Dr. Siegel in New York. Dr. Siegel determined that Decedent Gleicher's condition was critical and he needed to be transferred to the intensive care unit ("ICU"). The hospital staff agreed.

73.     But despite being in the emergency room for over seven hours, positive tests confirming Decedent Gleicher's critical acute pancreatitis, and his incessant moans and screams, the hospital staff refused to transport him to the ICU.

74.     Instead, Plaintiff Sharkey was presented with a bill of approximately $2,000 USD for the bloodwork and tests performed and the fraudulent "ambulance" transport that the hospital claimed Decedent Gleicher received. The hospital informed her that it did not accept insurance and would *not* transfer Decedent Gleicher if that bill was not immediately paid. In other words, hospital staff told her they would refuse care if she did not pay a non-negotiable bill, which

included a substantial charge for an "ambulance" transport that did not occur. Having no choice, Plaintiff Sharkey paid the bill.

75. Decedent Gleicher was transported to the ICU late night January 3. The family was denied access to him, and Decedent Gleicher, who was barely coherent and did not speak Spanish, had no way of communicating with the doctors. Despite their pleas, Plaintiff Sharkey and her family were denied access to Decedent Gleicher.

76. That night, Plaintiff Sharkey and her family finally spoke to ICU doctors treating Decedent Gleicher, including a surgeon, Dr. Walter Strofer, and a cardiologist. They informed her that Decedent Gleicher had pancreatitis. At this point, Decedent Gleicher's bloodwork reflected that he had elevated serum amylase levels, a key indicator of pancreatitis and its severity, of over 60 times the upper limit of normal. By any standard, this signaled that Decedent was in grave danger. The doctors, however, did not properly convey the gravity of the risk associated with these wildly elevated amylase levels. Instead, the doctors informed her that they were experienced at handling severe pancreatitis and that they had a whole team, including a surgeon and a gastroenterologist who were well equipped to treat her husband. They told her that he should stay at the hospital.

77. During this conversation, Plaintiff Sharkey specifically asked if she should arrange for a medical evacuation. They told her—unequivocally—that Decedent Gleicher's condition was not serious enough to warrant a medical air evacuation to New York. On a separate call, they told Dr. Siegel the same thing.

78. Plaintiff Sharkey, however, remained concerned and reached out to her and her husband's insurer to request a medical evacuation. The insurer began processing the claim.

20

79.     On the morning of January 4, the doctors informed Plaintiff Sharkey that her husband's condition was improving. They said his pain level had dropped dramatically and that his bloodwork indicated he was recovering. They said that they were going to take him out of the ICU and put him in intermediate care.

80.     They made the same representations to Dr. Siegel by text and phone directed to him in New York.

81.     These representations were false. Decedent Gleicher was not improving, and remained in critical condition, which was obvious by his condition and labs. He was still in agonizing pain (which the family and Dr. Siegel could not have known because they were denied meaningful access to him and only saw him briefly while he was heavily sedated). Further, his bloodwork indicated that he remained in critical condition. For example, his serum amylase and lipase levels remained extremely elevated at approximately 14 times the upper limit of normal levels, indicating he remained in critical condition.

82.     Further, contrary to their representations, the doctors did not move Decedent Gleicher to intermediate care, but kept him in intensive care due to the severity of his condition.

83.     During this time both Plaintiff Sharkey (in person) and Dr. Siegel (by phone and text) discussed their concern that Decedent had consumed methanol— which was the only reasonable explanation for his sudden and acute pancreatitis. Both were told that the hospital would look into testing him for methanol and providing appropriate antidote treatment if those tests were positive. These representations, however, were false— the doctors did no such testing and did not even attempt to look into the issue. As a result, the methanol poisoning, which has well known treatments that can neutralize the toxin and its effects, continued its deadly course through Decedent's system.

84.     Also during this time, the hospital doctors assured Plaintiff Sharkey and Dr. Siegel (by phone and text) that they would be pulling and testing blood samples at least every 6 hours to monitor his progress. Such frequent testing is critical in a case of severe acute pancreatitis to ensure that the disease is not progressing, and, if so, to make immediate adjustments to treatment to prevent further progression. This too was false—during the span of roughly three and a half days that the hospital treated Decedent, the staff ran only four sets of blood tests, with gaps of about 18-24 hours between them. Further, they never attempted to get a medical history for him and did not even create a chart for him. As a result, the hospital failed to detect Decedent's rapid decline and treat accordingly.

85.     The doctors continued misrepresenting to Plaintiff Sharkey and Dr. Siegel that Decedent Gleicher was improving into the morning of January 5.

86.     At the same time, Decedent Gleicher's insurance had, per Plaintiff Sharkey's request, taken steps to have him evacuated by air ambulance to New York. As part of the claim approval process, the insurer's medical reviewer reached out to the Central Romana hospital on January 4 to determine if air transportation was necessary. A doctor at Central Romana— Dr. Joel Cabrera— had a phone call with a doctor for the insurer at the insurer's office in the United States. Dr. Cabrera told him that the air transport was not medically necessary, that Decedent Gleicher was improving, and that the hospital was well equipped and able to properly treat him. Based on this representation, the insurer denied the claim for an air ambulance.

87.     These misrepresentations gave Plaintiff Sharkey, Decedent's doctors in New York, and Decedent's insurer a false sense of security. Had they known about Decedent's true condition, that the hospital had no intention of testing for methanol, that the hospital would not and could not properly monitor and treat Decedent, they would have arranged for an air

ambulance immediately. Indeed, even if insurance would not have covered the air ambulance, Plaintiff Sharkey would have arranged for it immediately at her own expense (which she later tried to do). Thus, Decedent Gleicher would have been transported out of the resort to New York on January 4, or the morning of January 5 at the latest. If transported at this time, he would have been saved.

88.    In the meantime, while the hospital was misrepresenting Decedent Gleicher's condition to Plaintiff Sharkey, Dr. Siegel, and the insurer, the hospital failed, through incompetency and lack of proper resources, to properly treat Decedent Gleicher. They failed, due to miscalculations of his height and weight, to properly administer the right amount of IV fluid—a critical treatment for acute pancreatitis—and, as described above, failed to properly monitor other signs of decline, including his white blood cell count, hematocrit levels, and enzyme levels. They also could not perform important diagnostic tests, such as MRI imaging, because they lacked the equipment (despite their advertisements representing that they had such equipment).

89.    During all this time, Plaintiff Sharkey and her family were, but for a few brief periods, denied access to Decedent. During the brief periods they did see Decedent, Plaintiff Sharkey and her family witnessed him suffering in extreme pain and left unattended. They observed staff members ignoring cries for help and talking and laughing amongst themselves. This conduct continued throughout the duration of Decedent's time in the ICU. Decedent was left alone, writhing in agony, unable to communicate with hospital staff due to the language barrier.

90.    By mid-morning January 5, with Decedent Gleicher's condition continuing to deteriorate, the hospital finally conceded to Plaintiff Sharkey that they were completely out of

their depth and unable to treat Decedent Gleicher. But the staff still refused to initiate a written request for evacuation. Plaintiff Sharkey was forced to draft the transfer letter herself.

91.    The hospital's Medical Director, Dr. Jose F. Lopez Larache, then signed the letter Plaintiff Sharkey had drafted. Dr. Lopez addressed the letter and sent it electronically to Dr. Siegel at NYU Langone, Decedent Gleicher's insurer, and others. The letter admitted that the hospital could not properly care for Decedent Gleicher and that he required an immediate medical evacuation.

92.    Specifically, the letter stated that Decedent Gleicher had "a sudden onset of severe pancreatitis" and that Dr. Lopez had "maintained ongoing communication with… Dr. Marc K. Siegel at NYU Langone Health in New York, who is prepared to assume immediate responsibility for his care upon transfer." The letter continued that his condition "remains critical," with significant risks of multi-organ failure, systemic inflammatory response syndrome, necrosis, sepsis, and acute respiratory distress syndrome. It further stated that he "continues to experience intense pain, with decreasing and darkening urinary output, and that [the hospital had] encountered delays obtaining repeat imaging."

93.    The letter further stated that Dr. Lopez had "serious concerns about the current trajectory of the illness in our facility," and that the "case requires advanced resources that exceed the optimal capabilities of a regional hospital such as ours."

94.    The letter continued to list resources that Decedent Gleicher needed and the hospital did not have, including "high-resolution specialized diagnostic imaging[,]... [r]apid interventional capabilities[,]... and [i]mmediate access to a multidisciplinary team including subspecialties in gastroenterology, infectious diseases, and hepatobiliary surgical intervention."

Importantly, these are all services and capabilities that the hospital had previously told Plaintiff Sharkey and Dr. Siegel that they had.

95.     The letter concluded: "I therefore strongly recommend and urgently request immediate approval for a medically supervised air evacuation (air ambulance or commercial medical escort, as appropriate) to NYU Langone Health in New York."

96.     These statements, while true, directly contradicted the hospital's prior statement to Plaintiff Sharkey, Dr. Siegel, and Decedent Gleicher's insurer that his condition was stable and that they were well equipped to handle his care. Had the hospital been upfront in the first place, Decedent Gleicher would have been evacuated earlier, would have received proper care in New York, and would have survived.

97.     Plaintiff Sharkey was unable to get an immediate approval from the insurer, so she made arrangements to book an air ambulance herself, fronting over $50,000. But due to severe weather and other carrier-side issues that would not have been present had the air ambulance been ordered earlier, multiple flights were delayed and rescheduled. As a result, Decedent Gleicher's air evacuation was delayed until the morning of January 7. These delays would not have been encountered had the hospital physicians not interfered with the air evacuation during the 36-to-48 hour window in which they represented that such evacuation was not medically necessary and that Decedent Gleicher was "improving."

98.     On January 6, prior to releasing Decedent Gleicher, the hospital presented Plaintiff Sharkey with a bill for more than $25,000 for the ICU care given to her husband. They demanded immediate payment of the bill, refused to detail or negotiate the charges, and told her that her husband would not be released if she did not pay the bill. Having no choice, Plaintiff Sharkey was forced to pay the bill.

99. In the meantime, Decedent Gleicher's condition worsened. His family was denied access to him as he continued to suffer in agony from multi-organ failure. His lab work indicated kidney failure, which required immediate dialysis. But the hospital was not equipped to provide such treatment, and did not.

100. Indeed, rather than perform treatment to help Decedent's kidneys, the hospital improperly stressed his kidneys by, among other things, administering a Fleet enema, which stresses kidneys by delivering a large phosphate and sodium load for the kidneys to clear out, instead of alternative enemas, like saline or water enema.

101. Decedent Gleicher managed to send a text to his wife crying for help, and informing her that he had had an involuntary bowel movement in his bed. No one tended to him or helped him. He was alone.

102. In the early morning of January 7, as an evacuation flight was approximately one hour from landing in La Romana airport to transfer him to the U.S., Decedent Gleicher went into cardiac arrest due to complications of his improperly treated severe acute pancreatitis. He did not survive long enough to board the aircraft.

103. His death was the direct result of the negligence and misrepresentations of the resort hospital and its doctors. The doctors that failed to properly care for Decedent and made misrepresentations contributed to his death included Dr. Jose F. Lopez Larache, Dr. Walter Strofer, Dr. Joel Cabrera, Dr. Stefany Mariel Munoz Soriano, Dr. Carlos Dominguez, and Dr. Ronnie Ramos.

**D.    The Hospital Wrongfully Caused the Wrong Body to Be Sent to New York and Wrongfully Caused an Autopsy on Decedent's Body.**

104. Plaintiffs, Decedent Gleicher, and their family are Jewish. Under Jewish religious law, a body must be handled with dignity at all times, including the identification, transport, and

26

burial preparation. Jewish religious law also requires the body to be buried as expeditiously as possible—ideally within 24 hours of death. Jewish religious law also generally forbids postmortem autopsy, because it violates the duty of bodily integrity owed to the deceased.

105.    Following Decedent Gleicher's death in the early morning of January 7, Plaintiff Sharkey and her family moved with urgency to fulfill these obligations.

106.    Specifically, working through Chabad of the Dominican Republic and the U.S. State Department, they secured a formal religious exemption from autopsy for Decedent Gleicher and permission to immediately repatriate his body from the Dominican Republic to New York.

107.    This exemption was communicated to the hospital and its staff.

108.    The hospital and its staff grossly mishandled Decedent Gleicher's body.

109.    International standards—including the World Health Organization/Pan American Health Organization Guidelines for the Management of Dead Bodies After Disasters (which are recognized in the Dominican Republic as the operating standard for postmortem handling)— require a continuous, unbroken, and meticulously documented record of control over human remains. This requires that bodies be properly stored, and tagged with at least two independent identifiers, with one affixed to the body (toe or wrist) and the other affixed to the body bag. The identifiers are to contain a case number and identify the decedent. Hospitals releasing bodies are to follow strict chain of custody requirements, including verifying that the primary body tag and the tag on the body bag match, and confirming that information matches information on the documents authorizing the release of the body. The hospital must document the release with signatures from the party from the hospital releasing the body and the party to whom the body was released.

27

110. The Central Romana hospital failed to adhere to these standards. It failed to affix a tag to Decedent Gleicher's body, it failed to properly tag the bag, it failed to properly store and handle his body, and it failed to adhere to required chain-of-custody and documentation protocols.

111. As a result, the hospital delivered the wrong body to the funeral company transporting Decedent Gleicher's body from the Dominican Republic to New York—Defendant Blandino. The body it delivered was of a deceased French citizen who had died several days prior to Decedent Gleicher's death, and who looked nothing like him, being approximately four to five inches shorter and twenty pounds heavier than him.

112. The hospital delivered the body to the transport company knowing that the body was being immediately and urgently transferred to New York for burial.

113. Defendant Blandino also failed to properly ensure chain of custody. Its failings included failing to obtain family confirmation that the body delivered was in fact Paul Gleicher's body, and failing to identify the body against photographs of the decedent.

114. Plaintiff Sharkey and her family discovered that the wrong body had been switched in New York on the eve of the funeral when the casket containing the body that they thought was Decedent Gleicher, but was not, was opened before their eyes. Plaintiff Sharkey and her family suffered intense shock, horror, grief, trauma, and mental anguish. To make matters worse, when they contacted Defendant Blandino to inform them of the issue, Blandino maintained, incorrectly, that the body delivered was "100 percent" Decedent's body, further adding to the family's distress and grief.

115. In addition to delivering the wrong body to New York, the hospital—in violation of the religious exemption granted Decedent Gleicher and communicated to the hospital—

28

delivered Decedent Gleicher's body to the forensic examiner's office in the Dominican Republic, where his body was autopsied.

116.    The body that the hospital delivered for autopsy was in a body bag that was not tagged with Decedent Gleicher's name and other critical identifying information. It was also in a bag bearing a label for an *entirely different* hospital: "Hospital Militar Docente FARD Dr. Ramón de Lara"—a military teaching hospital in Santo Domingo operated by the Dominican Armed Forces with no involvement in Decedent Gleicher's care.

117.    The family learned of this improper autopsy in New York, which further added to the shock, trauma, grief, and mental anguish they suffered upon discovery that the wrong body had been delivered. They remain emotionally scarred to this day.

## CLAIMS FOR RELIEF

### COUNT I
### (Violation of N.Y. Gen. Bus. Law §§ 349, 350 Against Defendants Central Romana and Casa de Campo)

118.    Plaintiffs reallege the above allegations as if fully alleged herein.

119.    Defendants' advertisements and representations about the resort and its amenities were consumer oriented.

120.    The deceptive acts and misleading representations alleged herein are attributable to Defendant Central Romana as well as Defendant Casa de Campo. The hospital and amenity representations were created or approved by Central Romana and disseminated by Casa de Campo as Central Romana's actual and apparent agent, and Central Romana's own statements on the hospital webpages to which the marketing emails linked formed part of the deceptive acts. Plaintiff Sharkey and Decedent Gleicher relied on these representations in New York.

121. Defendants made multiple misrepresentations and omitted material facts about the resort and its amenities through its advertisements and other communications sent directly to Plaintiff Sharkey and Decedent, including:

- That the resort had safe and premium food and cocktails, which necessarily meant that cocktails would be unadulterated of toxins, such as methanol;

- That the resort had fully trained medical staff for emergencies;

- That the resort had a private hospital on or near the premises that was fully equipped with trained specialists and state-of-the-art equipment to handle any emergency;

- That resort guests would receive preferential treatment and "VIP" treatment at this hospital;

- That translation services were available for patients; and

- That the resort had a fully equipped ambulance for transport of guests in case of an emergency.

122. These representations were false. The resort served drinks contaminated with a toxin. It had no trained medical staff on premises available for Decedent, and there was no real ambulance. The hospital was unsanitary and lacked critical life-saving equipment and qualified medical professionals. There was no VIP or preferential treatment for resort guests— to the contrary, even guests in critical condition such as Decedent were left unattended in the emergency room for hours, receiving no medical attention at all, and forced to clean up their own vomit. There were no translation services.

123. These misrepresentations were material. Indeed, had they not been made, Plaintiff Sharkey and Decedent would not have booked their trip or come to the resort when they did.

124. The transaction occurred in New York— Plaintiff Sharkey and Decedent were deceived in New York through direct advertising addressed personally to them and booked their stay from their home in New York.

125. As a result of these material misrepresentations, Plaintiff Sharkey and Decedent suffered injury.

126. Defendants' conduct demonstrated a conscious indifference to the known and obvious risks to Plaintiff Sharkey and Decedent such as to evince a high degree of moral culpability warranting the imposition of punitive damages.

## COUNT II
**(Fraud/Intentional Misrepresentation Against Defendants Central Romana and Casa de Campo)**

127. Plaintiffs reallege the above facts as if fully alleged herein.

128. Defendants made multiple misrepresentations and omitted material facts about the resort and its amenities through its advertisements and other communications sent directly to Plaintiff Sharkey and Decedent, including:

- That the resort had safe and premium food and cocktails, which necessarily meant that cocktails would be unadulterated of toxins, such as methanol;

- That the resort had fully trained medical staff for emergencies;

- That the resort had a private hospital on or near the premises that was fully equipped with trained specialists and state-of-the-art equipment to handle any emergency;

- That resort guests would receive preferential treatment and "VIP" treatment at this hospital;

- That translation services were available for patients; and

- That the resort had a fully equipped ambulance for transport of guests in case of an emergency.

129. These representations were false. The resort served drinks contaminated with a toxin. It had no trained medical staff on premises available for Decedent, and there was no ambulance. The hospital lacked critical life-saving equipment and qualified medical professionals. There was no VIP or preferential treatment for resort guests— to the contrary, even guests in critical condition such as Decedent were left unattended in the emergency room for hours, receiving no medical attention at all, and forced to clean up their own vomit. There were no translation services.

130. Defendants knew that these representations were false.

131. Defendants made these representations with the intent to defraud or induce Plaintiff Sharkey and Decedent.

132. Plaintiff Sharkey and Decedent reasonably and justifiably relied upon these misrepresentations and omissions.

133. As a result, Plaintiff Sharkey and Decedent suffered injury.

134. Defendants' conduct demonstrated a conscious indifference to the known and obvious risks to Plaintiff Sharkey and Decedent such as to evince a high degree of moral culpability warranting the imposition of punitive damages.

**COUNT III**
**(Strict Products Liability— Manufacturing Defect Against Defendants Central Romana and Casa de Campo)**

135. Plaintiffs reallege the above allegations as if fully set forth herein.

136. Defendants sold Decedent a product— namely a mixed cocktail.

137. The product was defective due to an error in the manufacturing process. Specifically, it was contaminated with methanol either through the intentional addition of methanol to the alcohol as a cutting agent, or as a byproduct of improperly distilled bootlegged liquor.

138. This defect existed at the time the product left Defendants' control, and the product was used for its normally intended purpose.

139. A reasonable user would not have discovered the defect through reasonable care.

140. As a result of the defective product, Decedent was injured.

141. Defendants' conduct demonstrated a conscious indifference to the known and obvious risks to Decedent such as to evince a high degree of moral culpability warranting the imposition of punitive damages.

## COUNT IV
### (Premises Liability Against Defendants Casa de Campo and Central Romana)

142. Plaintiffs reallege the above paragraphs as if fully alleged herein.

143. Defendants at all times owned and/or controlled the resort premises, including all restaurants and bars on the resort, and thus owed Decedent a duty of reasonable care.

144. Defendants knew or should have known that restaurants and bars on its premises were serving alcoholic beverages contaminated with methanol, which posed an unreasonable risk of danger to guests.

145. Defendants breached this duty by failing to use reasonable care in eliminating or mitigating this hazard.

146. As a proximate result of this breach, Decedent was injured.

147.    Defendants' conduct demonstrated a conscious indifference to the known and obvious risks to Decedent such as to evince a high degree of moral culpability warranting the imposition of punitive damages.

## COUNT V
**(Negligent Misrepresentation Against Defendants Central Romana and Casa de Campo)**

148.    Plaintiffs reallege the above paragraphs as if fully alleged herein.

149.    Defendant Central Romana had a duty, as Decedent's medical provider, to provide true and accurate information to Plaintiff Sharkey, Decedent's monitoring doctors in New York, including Dr. Siegel, and Decedent's insurer.

150.    Defendant Central Romana made false representations to Plaintiff Sharkey, Dr. Siegel, Decedent's insurer, and others. Specifically, Defendant Central Romana told these people and entities that they were fully equipped and able to adequately treat Decedent's acute pancreatitis, that his condition was "improving," and that a medical evacuation to New York was not medically necessary.

151.    Defendant Central Romana knew that the information it provided about Decedent's condition and the lack of a need of a medical air evacuation were desired by these people and entities for a serious purpose upon which Decedent's life depended.

152.    Plaintiff Sharkey, Dr. Siegel, and Decedent's insurer intended to and did in fact reasonably rely and act on this information to Decedent's detriment.

153.    As a result of these misrepresentations, Decedent was injured.

154.    Defendants' conduct demonstrated a conscious indifference to the known and obvious risks to Decedent such as to evince a high degree of moral culpability warranting the imposition of punitive damages.

## COUNT VI
### (Negligence/Medical Malpractice Against Defendant Central Romana)

155.    Plaintiffs reallege the above paragraphs as fully alleged herein.

156.    Defendant Central Romana, as Decedent's medical provider, owed him a duty of care.

157.    Defendant Central Romana breached this duty by deviating from accepted standards of medical care for the diagnosis and treatment of acute pancreatitis, including: (1) failing to consider methanol etiology; (2) failing to order toxic-alcohol screening; (3) failing to administer appropriate antidotes for methanol poisoning; (4) failing to initiate dialysis or other renal replacement therapy; (5) failing to properly hydrate Decedent with IV fluids; (6) failing to appreciate and diagnose Decedent's rapidly-declining condition; and (7) failing to timely escalate Decedent's care and cooperate with efforts to get Decedent medically evacuated to New York.

158.    As a direct and proximate cause of this breach, Decedent was injured.

159.    Defendants' conduct demonstrated a conscious indifference to the known and obvious risks to Decedent such as to evince a high degree of moral culpability warranting the imposition of punitive damages.

## COUNT VII
### (Interference with Right of Sepulcher Against Defendants Central Romana and Blandino)

160.    Plaintiffs reallege the above paragraphs as if fully alleged herein.

161.    Plaintiffs are Decedent's next of kin.

162.    Plaintiffs had a right to possession of Decedent's remains.

35

163.    By delivering the wrong body to New York and, in violation of Decedent's religious exemption, sending Decedent's body for autopsy, Defendants Central Romana and Blandino interfered with Plaintiffs' right to immediate possession of Decedent's body.

164.    The interference was unauthorized.

165.    The interference caused mental anguish to Plaintiffs.

166.    Defendants' conduct demonstrated a conscious indifference to the known and obvious risks to Plaintiffs as to evince a high degree of moral culpability warranting the imposition of punitive damages.

## COUNT VIII
### (Wrongful Death: N.Y. Est. Powers & Trust Law § 5-4.1 Against Defendants Central Romana and Casa de Campo)

167.    Plaintiffs incorporate the above allegations as if fully alleged herein.

168.    Decedent Gleicher died as a direct and proximate cause of the wrongful acts and neglect of Defendants Central Romana and Casa de Campo, which are described above.

169.    Decedent is survived by his wife, Plaintiff Sharkey, and his three children, among others, who have all suffered pecuniary loss by reason of his death.

170.    Plaintiff Sharkey is the duly appointed personal representative of Decedent's estate.

171.    As the personal representative, Plaintiff Sharkey hereby seeks all damages against Defendants available to her and Decedent's surviving family under N.Y. Est. Powers & Trust Law § 5-4.1, including an award of punitive damages.

## COUNT IX
### (Survival Action: N.Y. Est. Powers & Trust Law § 11-3.2 Against Defendants Central Romana and Casa de Campo)

172.    Plaintiffs incorporate the above allegations as if fully alleged herein.

173.    Decedent, at the time of his death, could have maintained the causes of action described in Counts I through VI above.

174.    These causes of action survive Decedent's death.

175.    Decedent suffered serious injuries as a result of the above-described misconduct, including severe and agonizing pain and suffering that persisted, unrelenting, for days.

176.    Through N.Y. Est. Powers & Trust Law § 11-3.2, Plaintiff Sharkey, as Decedent's personal representative, seeks all damages available to Decedent, including pain, suffering, and mental anguish he experienced prior to his death, and punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs hereby pray for judgment, awarding Plaintiffs: (1) compensatory damages, including economic damages for funeral and transport expenses, medical bills, and loss of economic support, and non-economic damages, including pain, suffering, and mental anguish; (2) punitive damages; (3) prejudgment and postjudgment interest; (4) reasonable attorneys' fees and costs; and (5) for any other relief the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all issues so triable.

Dated: July 2, 2026

Respectfully Submitted,

ELIAS LLC

By: */s/ Richard M. Elias*
Richard M. Elias, Bar No. 5381314
27 W. Lockwood Ave
St. Louis, MO 63119
314-391-6820
relias@eliasllc.com